IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JERRY BULLOCK, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:15-cv-3645 |
| | § | |
| FLUOR ENTERPRISES, INC. AND | § | |
| FLUOR CORPORATION, | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW, Plaintiff, Jerry Bullock, and files this Original Complaint, complaining of Defendants, Fluor Enterprises, Inc. and Fluor Corporation (hereinafter, collectively referred to as "Fluor"), and for his causes of action, shows the Court as follows:

## I.
## INTRODUCTION

1.    This action seeks equitable relief, actual economic damages, punitive damages, compensatory damages, attorney's fees, expert witness fees, taxable costs of court, prejudgment and post-judgment interest for Defendants' violation of 18 U.S.C. § 1514A regarding Plaintiff, as well as Defendants' breach of contract with Plaintiff and breach of promises previously made to Plaintiff.

2.    Plaintiff demands a jury on all issues triable to a jury.

## II.
## PARTIES

3.    Plaintiff, Jerry Bullock is a former employee of Defendants.

4.    Defendant Fluor Corporation is a Delaware corporation duly authorized to conduct business in the State of Texas.   This Defendant may be served with summons by serving its

registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service, Inc., 211 E. 7th Street, Suite 620, Austin, Texas 78701.

5.      Defendant Fluor Enterprises, Inc. is a California corporation duly authorized to conduct business in the State of Texas.   This Defendant may be served with summons by serving its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service, Inc., 211 E. 7th Street, Suite 620, Austin, Texas 78701.

6.      Whenever in this Complaint it is alleged that Defendants committed any act or omission, it is meant that the Defendants' officers, directors, vice-principals, agents, servants, or employees committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification or approval of Defendants or was done in the routine normal course and scope of employment of the Defendants' officers, directors, vice-principals, agents, servants, or employees.

**III.**
**JURISDICTION AND VENUE**

7.      This is a civil action over which this court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 (a)(3) and (4) and 1367(a).

8.      The Court has personal jurisdiction over Defendants since they regularly conduct business in the State of Texas, and therefore have minimum contacts with the State of Texas.

9.      Alternatively, the Court has personal jurisdiction over Defendants since acts giving rise to this suit occurred within the State of Texas.

10.      Venue is proper in the Southern District of Texas, under 28 U.S.C. § 1391(b) since a substantial part of the events or omissions giving rise to this cause of action occurred in the Southern District of Texas.

11.     All conditions precedent to filing this lawsuit have been met.

## IV.
## PROCEDURAL REQUISITES

12.     On April 3, 2015, Plaintiff filed a Complaint with the United States Department of Labor—Occupational Safety and Health Administration, pursuant to the Sarbanes-Oxley Act of 2002, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.

13.     On April 27, 2015, Plaintiff filed an Amended Complaint with the United States Department of Labor.

14.     More than 180 days have passed since the filing of the Complaint with the United States Department of Labor, and a final decisions has not been issued by the Secretary of Labor.

15.     Plaintiff has met all conditions precedent to the filing of this suit.

## V.
## FACTS

16.     Fluor Corporation is a Fortune 500 international construction firm headquartered in Irving, Texas.

17.     Fluor Corporation was established in 1912, currently employs over 40,000 employees in over 81 countries around the world and is a publically traded corporation (NYSE symbol FLR).

18.     Fluor Enterprises, Inc. is a subsidiary of Fluor Corporation.

19.     Jerry Bullock began his employment with Fluor in 2001.

20.     Throughout his employment, Mr. Bullock was assigned to work on assorted projects, some of which were Joint Venture projects in which Fluor collaborated with third party companies on the project.

21.     In 2010, Mr. Bullock was assigned to work on a Joint Venture project that Fluor had recently been awarded with Worley Parsons, Limited.

22.     Under Fluor's Code of Business Conduct, Fluor promised that it "will not tolerate any form of direct or indirect retaliation that arises from reporting suspected illegal or unethical conduct in good faith."

23.     More specifically, Fluor promised that "[i]f a report is made in good faith, [Bullock would] be protected even if the concern turns out to be unsubstantiated."

**A.     Bullock Complains that Fluor is Defrauding its Joint Venture Partners**

24.     While working on the Joint Venture, Bullock reported to Susana Suarez, Fluor's VP of HR, concerns he had regarding instructions that he and others within the Joint Venture had been given by their Project Director, Neil Ames, regarding billing on the project.

25.     Specifically, Mr. Ames had instructed Fluor employees who were working on the Joint Venture with Worley Parsons to charge the Joint Venture for work that had been performed on separate Fluor projects.

26.     This was fraudulent activity, and a clear violation of Fluor's policies and procedures.

27.     The Fluor Project Charging Principles state that employees must charge the project that they are working on.

28.     Moreover, the Joint Venture would be paying for work performed on unrelated Fluor projects, thereby fraudulently increasing Fluor's profits and decreasing the profits of the Joint Venture, and thus to the third party, Worley Parsons.

29.     On January 21, 2014, Mr. Bullock spoke to Catherine McCraw, Manager of Fluor Employee Relations, and explained that Mr. Ames had given clear instructions to Gary Read to

4

perform work on other Fluor projects, but to charge the Worley Parsons Joint Venture for that work performed, in violation of Section 12.2 of the Joint Venture agreement Fluor had with Worley Parsons.

30.     Bullock explained to Ms. McCraw that if the employees followed Mr. Ames' instruction, Worley Parsons would be cheated out of money while Fluor would financially benefit, since the Joint Venture would be paying Gary Read for work performed for a separate Fluor only project and not the Joint Venture.

31.     Bullock also explained that Mr. Ames' instruction violated Fluor's policy governing Project Charging Principles.

32.     Bullock also provided a copy of the policy to Ms. McCraw to help her understand Bullock's concerns.

33.     Around this time, Fluor discussed the idea of removing Bullock from the project.

34.     Management had discussed having Gary Read, in addition to performing his own duties on the project, also fill Bullock's role for the remainder of the project, since it would soon be winding down.

35.     This would have freed up Bullock to begin work on a soon to be awarded Fluor only project.

36.     Toward that end, when Bullock learned that his work on the Worley Parsons project may be ending soon, he contacted Geoff Telfer, the CFO for the Energy and Chemical Business Units for whom Mr. Bullock had worked the previous ten years, to discuss any opportunities for Bullock.

37.     In response, Mr. Telfer indicated that he had plenty of work in Houston, and for Bullock to contact him when he was back in Houston so that they could discuss a position for him.

38.     Around that same time period, Glenn Lutz, President of Fluor Arabia, contacted Susana Suarez to express his concern that the decision for Gary Read to replace Mr. Bullock was inappropriate and this decision could jeopardize the integrity of Joint Venture.

39.     Nevertheless, on March 1, 2014, Mr. Bullock was informed that he was in fact being removed from the Joint Venture project and had thirty days in which to wrap up his duties.

40.     Mr. Bullock emailed Robert Free, VP/Controller of Finance-Mining at Fluor, stating that the Joint Venture would be exposed to significant financial risk if Mr. Read were to take his place on the project at that point.

41.     Mr. Bullock provided a detailed list of outstanding critical items, which he had performed during the entirety of the project, and which Gary Read had not been involved on in that project.

42.     In light of pressure and concerns from Worley Parsons corporate management, Mr. Ames' boss instructed Mr. Ames to keep Mr. Bullock on the project through July in order to address some of these issues.

43.     Throughout April and May 2014, there was a significant amount of discussion regarding the billing practices to the Joint Venture.

44.     Eventually, Fluor agreed to investigate the concerns raised by Bullock regarding whether Fluor was billing hours to the Joint Venture for work performed on separate Fluor projects.

45.     Fluor placed one of its Ethics Investigators, Martial Robichaud, in charge of the investigation.

46.     During this time, Mr. Bullock's relationship with his Mr. Ames and Mr. Read deteriorated, leading to extremely abrasive conduct on the part of both Mr. Read and Mr. Ames toward Mr. Bullock.

47.     In fact, on May 16, 2014, a member of Fluor's executive project team informed Mr. Bullock that Ames had acknowledged to him that Ames had been inappropriately abrasive to Mr. Bullock, and that Ames owed Mr. Bullock an apology.

**B.     Fluor Conducts a Sham Investigation and Strips Bullock's Duties**

48.     In May 2014, Gary Read informed Mr. Bullock that, even though Bullock was still assigned to work on the Joint Venture project, that he would no longer attend the staff and PSR meetings, and that Read would be going in his place.

49.     PSR meetings are held to review the monthly progress on the project and to address significant issues with executive corporate management.

50.     Bullock's participation in those meetings was essential.

51.     About that same time, Mr. Bullock was offered the Business Services Lead position for a Fluor project called the Cristal Project, which would be starting up around the summer of 2014.

52.     Because the Cristal Project was planned to commence in the summer, Bullock accepted the Business Services Lead position for the Cristal Project, which he would begin when he was finished with his work on the Worley Parsons Joint Venture.

53.     On June 3, 2014, Mr. Robichaud contacted Mr. Bullock regarding his investigation.

54.     During that discussion, Mr. Bullock outlined his concerns regarding the instruction that had been given with respect to the Joint Venture billing, and why he had raised his concerns with Fluor management.

55.     Bullock also explained that because he informed Fluor and the Joint Venture of the fraudulent billing instruction from Mr. Ames, and the instruction was now being investigated, he

did not think that Read had actually had the opportunity to bill Worley Parsons for improper time worked in accordance with Ames' instruction.

56.     Mr. Bullock also informed Mr. Robichaud that Mr. Read was already improperly billing time on his other Fluor projects.

57.     Specifically, Bullock explained that even though Read was performing work on three separate Fluor projects, he was only billing all of his time to one those projects, which was fraudulent.

58.     Mr. Robichaud refused to listen to the information provided by Bullock.

59.     Instead, Mr. Robichaud told Mr. Bullock that the scope of his investigation was far narrower than that, and he was only tasked with determining whether Mr. Read had actually billed the Worley Parsons Joint Venture for work he did on other Fluor projects.[1]

60.     On June 5, 2014, Mr. Bullock reached out to Carlos Hernandez, Chief Legal Counsel Fluor, and explained that since he had brought forth the improper instructions by his project manager to defraud the Joint Venture, that Mr. Bullock felt bullied, harassed, and that he was being retaliated against.

61.     Mr. Bullock informed Mr. Hernandez that he was afraid he was going to lose his job because he complained.

62.     On June 12, 2014, Mr. Robichaud and Robin Chopra, VP Fluor Internal Audit, arranged a conference call with Mr. Bullock.

---

[1] This is significant since it clearly demonstrates that Fluor engaged in a sham investigation by limiting the scope of the investigation such that Fluor could claim that it could find no evidence of fraud.

8

63.     Mr. Chopra informed Mr. Bullock that as far as he was concerned, Neil Ames, the Project Manager, could do "what he wants," and that he did not care what Worley Parsons thought about it.

64.     During this conversation, it was quite clear to Mr. Bullock that Mr. Chopra was angry with Mr. Bullock for raising the fraud allegations.

65.     Mr. Bullock then contacted Robert Free, and again reiterated that what was happening was clearly unethical, improper, and violated the project charging principles.

66.     Mr. Bullock also reiterated once again that Worley Parsons could certainly characterize Fluor's conduct as fraud.

67.     Bullock also complained that the retaliation to which he was being subjected goes against Fluor's Code of Business Conduct and Ethics.

68.     In July 2014, Robert Free called Mr. Bullock and informed Mr. Bullock that he had "lost confidence" in Mr. Bullock's "decision making."

69.     At that time, Mr. Free told Mr. Bullock that he still had strong confidence in Bullock's "financial abilities."

70.     Mr. Free also told Bullock that he would not be selected for the Cristal project.

71.     It was evident to Mr. Bullock that the decision to remove Mr. Bullock from that position, which he had already been given was retaliation against Mr. Bullock based on his decision to bring the unethical conduct and potential fraud violations to Fluor management's attention.

**C.      Fluor Refuses to Assign Bullock Any Additional Work**

72.      After he was told that Fluor was rescinding the offer of the Business Services Lead position on the Cristal Project, Bullock once again reached out to Mr. Telfer about the opportunities they had previously discussed in Houston.

73.      However, on this occasion, Bullock was told that there were no opportunities available for him in Houston or in fact, anywhere.

74.      On October 6, 2014, Bullock was told he would be placed on a leave of absence on October 8, 2014.

75.      On October 17, 2014 Mr. Bullock reached out to Dan Plummer, Controller of the Americas, who agreed to meet with Mr. Bullock to discuss upcoming project opportunities with Fluor.

76.      On October 22, Mr. Bullock and Mr. Plummer met.

77.      During that meeting, Mr. Plummer simply reiterated that Fluor simply had no work for Mr. Bullock.

78.      In other words, after over thirteen successful years with Fluor, Fluor was refusing to assign Bullock any work.

79.      Robert Free and Robin Chopra were blocking Mr. Bullock from obtaining any work on any projects because Mr. Bullock complained about Fluor's unethical and fraudulent billing instructions.

80.      By doing so, Fluor violated the promises it had made to Mr. Bullock, and the contract it had with him to ensure that Mr. Bullock would be free from retaliation in the workplace.

## VI.
## CAUSE OF ACTION—VIOLATION OF 18 U.S.C. § 1514A

81.     Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as fully set forth herein.

82.     During his employment with Defendants, Plaintiff complained about conduct he believed constituted a violation of the laws listed set forth in 18 U.S.C. § 1514A(a)(1).

83.     Plaintiff's complaints were protected by the Sarbanes-Oxley Act of 2002, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 18 U.S.C. § 1514A(a).

84.     As described above, Plaintiff was subjected to an adverse action, and terminated from his employment with Defendants.

85.     The protected activity in which Plaintiff engaged was a contributing factor in the adverse action, and termination of Plaintiff's employment with Defendants.

86.     As a result of Fluor's unlawful retaliation toward him, in violation of 18 U.S.C. § 1514A, Bullock has suffered damages.

## VII.
## CAUSE OF ACTION—BREACH OF CONTRACT

87.     Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as fully set forth herein.

88.     Jerry Bullock entered into an Employment Agreement with Fluor.

89.     Under that Agreement, Fluor specifically agreed not to retaliate against Plaintiff for reporting any suspected illegal or unethical conduct in good faith.

90.     During his employment, Plaintiff raised allegations of unethical and illegal conduct that he suspected was being committed by Fluor.

11

91.     As described above, because of the allegations of illegal and/or unethical conduct that Plaintiff raised, Fluor retaliated against Plaintiff by subjecting him to an adverse action and terminating his employment, in breach of his Agreement with Fluor.

92.     As a result of Fluor Corporation's breach of the Employment Contract, Bullock has suffered damages.

## VIII.
## CAUSE OF ACTION—PROMISSORY ESTOPPEL

93.     Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as fully set forth herein.

94.     Fluor promised to Plaintiff that it would not retaliate against him reporting suspected illegal or unethical conduct in good faith.

95.     In reliance upon Fluor's promise, Plaintiff raised complaints of illegal and/or unethical conduct being committed at Fluor.

96.     As described above, because of the allegations of illegal and/or unethical conduct that Plaintiff raised, Fluor retaliated against Plaintiff by subjecting him to an adverse action and terminating his employment, in breach of the promises made to Plaintiff.

97.     As a result of Fluor's breach of the promises previously made to Plaintiff upon which he relied, Plaintiff has suffered damages.

## IX.
## DAMAGES

98.     Each and every allegation contained in the foregoing paragraphs are realleged as if fully rewritten herein.

99.     Plaintiff seeks to be made whole and, as a result, requests all appropriate damages from Defendant allowed under the law.

100.    Plaintiff has lost compensation and benefits, for which he seeks as back pay, including wages, commissions, bonuses, benefits and any other compensation.

101.    In addition, Plaintiff demands front pay, including but not limited to any and all future lost wages, commissions, bonuses, benefits and any other compensation.

102.    Plaintiff demands attorney's fees, expert witness fees, pre-judgment and post-judgment interest, costs of court and any other damages allowed.

## X.
## ATTORNEY'S FEES

103.    In addition, as a result of the acts and omissions of Defendant, as specifically set forth herein, it was necessary for Plaintiff to secure counsel to present and prosecute this matter on her behalf.

104.    Plaintiff has retained the services of the undersigned counsel of record, and accordingly, Plaintiff sues for reasonable attorney's fees as provided under Chapter 38 of the Texas Civil Practice & Remedies Code and 18 U.S.C. § 1814A(c)(2)(C).

## XI.
## JURY DEMAND

105.    Plaintiff requests a trial by jury on all issues triable by a jury in this case.

## XII.
## RELIEF REQUESTED

106.    Plaintiff respectfully requests that he be granted judgment for the following relief:

a.    For actual damages, including appropriate backpay, commissions, bonuses and any other compensation, and reimbursement for lost pension, insurance, and all other benefits;

b.    For liquidated, compensatory and punitive damages as allowed by law;

c.    For attorneys' fees;

      d.     For expert witness fees incurred by Plaintiff in the preparation and prosecution of this action;

      e.     For pre-judgment and post-judgment interest as allowed by law;

      f.     For costs of court, costs of prosecuting Plaintiff's claim; and

      g.     For such other and further relief to which Plaintiff may be entitled under the relevant statutes or be justly entitled.

WHEREFORE PREMISES CONSIDERED, Plaintiff prays that after trial by jury he be awarded the relief requested above, and all such other further relief, whether at law or in equity, to which Plaintiff may show himself justly entitled.

14

Respectfully submitted,

 /s/ Delana Cline
Delana Cline
State Bar No. 24009960
dcline@cline-ahmad.com
Nasim Ahmad
State Bar No. 24014186
nahmad@cline-ahmad.com
CLINE | AHMAD
723 Main Street, Suite 904
Houston, Texas 770020
Telephone: (832) 767-3207
Facsimile: (281) 864-4379

Of Counsel:
     Joseph Y. Ahmad
     Texas Bar No. 00941100
     joeahmad@azalaw.com
     AHMAD, ZAVITSANOS, ANAIPAKOS,
     ALAVI & MENSING P.C.
     1221 McKinney Street, Suite 3460
     Houston, Texas   77010-2009
     Telephone:   (713) 655-1101
     Telecopier:   (713) 655-0062

ATTORNEYS FOR PLAINTIFF
JERRY BULLOCK

15